THE PEOPLE, *ex rel.* ISRAEL, *against* TIBBETS AND
OTHERS.

The remedy    TALCOTT, (Attorney General,) at the last term, moved for
by information
in nature of a leave to file an information in nature of a *quo  warranto*
*quo  warranto*
lies against persons who have usurped, or intruded into the office of directors of an insurance
company, or any other corporation.

So against persons who intrude into any office or offices created for the government of a
corporation.

So it lies against persons who usurp the right to be a corporation.  To be a corporation is a
franchise.

The court will not deny leave to file an information in nature of a *quo  warranto* against
persons who unlawfully intrude into offices, on the ground that the offices are merely annual;
and that, therefore, it is doubtful whether, according to the course of the court, a trial can be
had before the office expires; provided the application for leave to file the information be made
the earliest opportunity, after the offence complained of is committed.

The act incorporating The Franklin Fire Insurance Company, gave a vote for each share
of stock; but provided that no share should entitle the holder to vote, unless the stock should
have been held by him, at least 60 days next and immediately preceding an election; and
that the major part of the directors should constitute a board, and have power to make such
by-laws, rules and regulations as to them should appear needful and proper respecting the
election, &c. and they passed a by-law requiring a transfer of stock to be registered in order
to be effectual.  And about a month preceding the annual election, they passed another by-
law, reciting that it might happen that stock might be sold within 60 days next immediately
preceding an election, but not transferred on the books of the company at the time of the elec-
tion; and that the seller, in whose name it might stand, might offer to vote upon it, though
he might have no beneficial interest in it; and enacting that such voting would be a violation
of the act of incorporation; and that it should be the duty of the inspectors of the election,
whenever they should or might suspect, that the stock proposed to be voted upon, had been
sold or bargained for, or contracted to be sold within the 60 days, but not transferred on the
books, to require the person proposing to vote to adduce satisfactory proof to the inspectors,
either by his own oath or affirmation taken before some competent officer, or other proof that
the stock had not been sold, or the beneficial interest, or any part of it, parted with by any
bargain, or contract of sale, within the 60 days; and in default of such proof to reject the
vote.  *Held*, that this by-law was void; that the vendor might vote, notwithstanding the
transfer within the 60 days, the same being unregistered; and it appearing that certain candi-
dates for the office of director were elected in consequence of this by-law being enforced, the
court allowed an information in nature of a *quo  warranto* to be filed against them.

A corporation have no power, by a by-law, to demand an oath of a stockholder in its funds
to order to test his qualifications as a voter.

against Tibbets and others, President and Directors of the Franklin Fire Insurance Company, on affidavits, that on the 10th January, 1825, at Wall Street, in the city of New York, between 12 at noon and 2 P. M. an election was held for directors; that there were two sets of candidates; one list being headed by the name of Tibbets, the other by that of Israel; that by the 4th section of the company's charter, it is provided, that the directors should, at all times, during their continuance in office, be stockholders of the company *in there own right;* and that no share should entitle the holder to vote, unless the stock should have been *held by him, at least* 60 *days next immediately preceding an election;* and by the 8th section, that the major part of the directors shall constitute a *board,* and have power to make and prescribe such by-laws, rules and regulations, as to them shall appear needful and proper respecting the *election and meeting of directors,* the transfer of shares, the management and conducting of the business of the corporation, and all matters appertaining thereto; provided that such by-laws, &c. should not be repugnant to the constitution and laws of this state, or of the United States; that they had passed a by-law requiring the transfer of stock to be registered, in order to its being effectual; that immediately after 12 at noon, of the 10th January, 1825, the inspectors of the election began to receive proxies for the Tibbets list, which were objected to by Mr. Dey, a counsellor at law, in behalf of various stockholders, on the ground that some of them were sealed and some of them not sealed, some with witnesses and some without, and some in the name of executors and administrators, without proof that they were the parties, represented, whereas they should have been accompanied with the surrogate's certificate; and he demanded an inspection of them which was denied, on the ground that the inspectors would judge; and that there was not time for Mr. Dey to inspect them; and he particularly objected that no one had authority to vote on the stock of Enos Collins, of Halifax; but the ballot for this and various other stock, represented by proxy, were put into the box without allowing Mr. Dey a chance to examine the authority upon

which they were received, and upon the ground that the inspectors were satisfied. Various other objections in the course of the election were made by Mr. Dey to votes by proxy; but in no instance was he allowed to examine the authority upon which they were given, nor were any of his objections allowed.

That previous to the election, a small book had been made out and furnished to the inspectors, containing the amount of stock and names of those who held it, entitled to vote, and also other stock and the names of those who held it not entitled to vote, which they made their guide in the receipt of ballots; that on one Wells offering to vote for the Israel list on three proxies, representing 480 shares, they refused his ballots on the authority of this book, saying that a part, at least, of the stock he represented had been sold by the persons in whose names he appeared. He denied this, and Mr. Dey demanded the stock leger to test the fact, declining to receive the small book as evidence; that the inspectors, however, declared themselves bound by this book, saying they had not the control of the stock leger, and that Mr. Dey was not a stockholder; and in answer to several demands made of the leger for the same purpose by stockholders, the inspectors said they should not have it; and no books of the company were produced to show how the stock, offered to be voted upon, stood.

That on Mr. Wells reiterating his demand to vote, the copy of a by-law of the company was produced and exhibited to Mr. Dey, passed December 13th, 1824, in these words: " Whereas, in and by the act to incorporate this company, it is provided that the directors shall be elected by the votes of the *stockholders or their proxies,* but that no share shall entitle the holder to vote at an election of directors, unless the same shall have been held by him at least 60 days next immediately preceding such election; and whereas it may happen that stock may be sold within 60 days next immediately preceding an election, but not transferred on the books of this company, at the time of such election, and that the seller, in whose name it may have stood, may offer to vote on such stock, either by himself or by his proxy, although **he may** have no beneficial interest therein at the time either

of such election or of executing such proxy: It is, there-
fore, hereby declared, that to allow stock so circumstanced
to be voted on, either by the person in whose name it has
so stood, or by his proxy, is a violation of the spirit, and
contrary to the true intent and meaning of the said act of
incorporation ; and, that, it appearing needful and proper
to pass a by-law prohibiting all such voting; in order to
provide an adequate remedy in the premises, be it, there-
fore, enacted, and it shall be and hereby is made the duty
of the inspectors, at any election of directors, whenever
they shall or may *suspect*, that any of the stock, on which
any of the vote or votes may be offered, *has been sold or
bargained for, or contracted to be sold* within the 60 days
next immediately preceding such election, but which shall
not have been transferred on the books of this company, *to
require the person, offering such vote or votes, to adduce
satisfactory proof to the said inspectors, either by his own
oath or affirmation taken before some competent officer, or
other proof, that such stock has not been sold, or the bene-
ficial interest therein, or any part of such interest parted
with by any bargain, or contract of sale, within the 60
days next preceding such election.*   And that, unless such
proof be adduced, no such vote or votes shall be received
or allowed by the said inspectors."

That Mr. Dey objected, that this by-law had no force,
because it was passed within 30 days previous to the elec-
tion ; that no notice of it had been published ; that it was
fraudulent and void, and the stockholders not bound by it;
that the inspectors admitted no notice had been given of
the law ; that on the ground of this by-law, and the small
book, they refused the votes of Wells ; that the same ground
was taken against several other proxies ; that upon being
questioned, repeatedly, at different times during the election,
whether the inspectors insisted the party objected against
should swear, the inspectors replied they asked no man to
swear ; he might swear or not just as he pleased ; they
were bound by the by-law, and if he (the voter) would fur-
nish the proof, they would look at it ; that it was not till
about half past one P. M. that Mr. Dey was enabled to ob-
tain a copy of the by-law : after which several voters made

affidavits on which their votes were received; and some were refused, because the affidavit did not exactly conform to the by-law. A proxy on 50 shares given by the executors of J. T. Glover, deceased, being objected to, S. Glover, one of the executors, made affidavit that the executors, "are at present the *bona fide* owners of 50 shares of the capital stock, &c. and that they have been such owners as aforesaid for a period of more than 60 days prior to this date;" that the inspectors determined not to receive the vote, because the affidavit did not conform to the by-law; soon after declared that it was 2 o'clock, and the vote was finally rejected. That upwards of 800 other shares were denied votes on the same ground; that a considerable number of shares were allowed votes by the inspectors, without any proof under the by-law, though stockholders friendly to the Israel list objected that such stock had been sold.

That the Tibbets list finally prevailed and was elected by a majority of only 186 votes over the Israel list; and that this success was owing to the rigid adherence to the by-law on the part of the inspectors; that most of the directors thus elected had also been directors during the preceding year.

Several affidavits were read against the motion, showing, that, shortly previous to the passage of the by-law, it was known that sundry persons were making collusive purchases of stock at a very high price, within 60 days previous to the election, for the avowed purpose of effecting a change in direction of the company; stipulating in their contracts that the stock should not be transferred till after the election, because the transfer would disqualify the stock to be voted on; that to prevent such a consequence, the by-law was passed, under the advice of eminent counsel, including the late Chancellor Kent; that the list of stock entitled to vote, or disqualified under the by-law, was made out by the secretary of the company, by which the inspectors were guided; that the inspectors believed the list to be correct in every particular; that several shares, suspected by the directors to have been the subject of a collusive contract of sale, had, since the election, been actually transferred on the books;

that it was the invariable custom in conducting the election of chartered companies, in the city of New York, to furnish the inspectors with a list of the stock qualified and not qualified to vote; that this very much facilitates the business of the election; that in this instance, it was not furnished for the purpose of controlling the decision of the inspectors; but as containing information confidently believed to be correct, and to put them on inquiry as to the qualifications of the various persons who might offer to vote, either in person or by their proxies; that such lists were generally considered *prima facie*, but not conclusive evidence; and the list, in this instance, was so treated; that no undue partiality was exhibited by the inspectors in favor of the Tibbets list; but that the election was fairly conducted, according to the by-law; that the proxies objected to by Mr. Dey were correct, &c.; that in several instances, the contracts of sale aimed at by the by-law were accompanied with the agreement, that the purchaser should vote on the stock sold by proxy.

The cause was argued at the last term.

The affidavits for and against the motion having been read,

*S. Jones* opened the argument for the motion. He said that, *prima facie*, every share in the company was entitled to one vote, and unless this right was repelled by clear evidence; unless there was a defect either in ownership, or the appointment of proxies, or some misconduct amounting to a disqualification, the votes for the Israel ticket should have been received. The defeat of this ticket was mainly effected by the magic operation of the by-law. The inspectors properly established for their government the rule to be found in the charter of the company, that the stock of the individual offering to vote must have been held by him during 60 days, next and immediately preceding the election: but they then came to the question, what is to be deemed a *holding*? They answered that the voter must have the stock, not only in his name, but the entire right must be vested in him during that time; not even contracted to be sold; that one may have both the legal

and nominal interest, and yet be without the right to vote. This we deny. The book of stockholders or of transfer was the proper evidence. Who is the literal holder? Is it not the man in whose name the stock stands? The language of the charter is that each share *held* by the voter 60 days, &c. may be voted upon by him. It is admitted that the stock had stood in the names of the persons rejected. They stood on the books; they had been stockholders beyond all doubt, and there was no evidence that they had transferred their stock, except the *ex parte,* unofficial list, constantly resorted to by the inspectors. Did the legislature mean to disqualify one, because he had made some contract about his stock within the 60 days? The act may be satisfied short of this. Its object was to prevent any change of voters within that time. It meant that though one sold his stock within the sixty days, yet he might still vote upon it. The act did not mean that it should be wholly unrepresented. Till transferred upon the books, the legal title continued in the former holder. The act does not require that the voter should hold the stock in his own right. There is a clause in the same section requiring, for the purpose of being a director, a holding in one's own right, showing that the legislature understood the distinction between trustees and *cestuis que trust,* and spoke accordingly. *Holder,* here, stands simply and alone. Shall we be told that though a stockholder could not transfer his right to a third person, yet he lost it himself? Why should it have this effect any more than the mere pledge of stock for a loan? On what is the right to vote founded? Upon stock. If my vendee allows me to retain the stock in my name, I am his trustee, and vote under his direction. Shall my *cestuy que trust* be deprived of his votes? I may remain such trustee for years, or months, or a shorter time. The act contemplates this case, and attaches no other disability than ineligibility to the office of director. The inspectors admitted the votes of executors and administrators, who are mere trustees, yet they never thought of inquiring whether the holder died within the 60 days.

Every stockholder may vote by proxy. One, by leaving his shares standing in the name of the vendor, consti-

tutés him, *ipso facto*, his proxy. Suppose a treaty, or understanding, by which A. is to become a purchaser six months after the next election, upon the faith of which the vendor gives a proxy to the contemplated vendee so as to comply with the form of the act ; would not this be good ? It is the same thing, if, on a sale *in præsenti*, the parties agree that the stock shall remain in the name of the vendor, with the view that he shall vote at the election. The voting is a part of the consideration. The vendor asks less for the stock, perhaps, by reason that he retains the right to vote. Suppose it is a transfer of one-third of the vendor's interest in the stock, must he loose his entire vote ? No. If every one of these shares, the right to vote upon which was questioned and overruled, had been absolutely sold, but suffered to stand in the name of the respective vendors, they would still have had a right to vote, unless plain fraud against the vendee was made out.

No one would have a right to object against the vote, except the vendee, by reason of duress or fraud. The president or directors cannot do it, for the sake of holding their offices. The objection must come from some one who can compel the change of the vote. A Court of Equity would enforce the reservation by the vendor of a right to vote. The plain intent of the legislature was, that the directors should be chosen by the stock. This is the cardinal object to be followed ; nor should a single share be excluded upon mere presumption. This should not be admitted unless upon a plain rule, laid down by the act, from which there is no escape. To make this act operate as a prohibition, there must be a plain, full and actual, transfer apparent upon the books.

If the statute has not sanctioned the disqualification contended for, it cannot be created by by-law. Such a by-law is in restraint of right, and the corporation must show that it accords with the express powers given to the company. The power to make by-laws is conferred by the 8th section, which, to be sure, mentions the transfer of stock as one subject ; but it is left to other parts of the law to de-

NEW YORK,
May, 1825.

The People
v.
Tibbets.

termine who is a holder.   The company cannot determine this, therefore, the law settles it.

Mr. Wells' case is a complete illustration of the doctrine contended for against us.   On his offering to vote, the inspectors turned to a book, and told him he had sold out. This being denied and the stock standing in the proper names, the inspectors had no right to reject the votes.   At all events, they were bound to produce proof of the transfer. They showed no document establishing the pretended transfer.   Not a particle of proof was offered ; and nothing is now shown to make it out.   It was necessary to show affirmatively that the stock had been sold.   Instead of this, they called on Wells, under the by-law, to prove negatively that it had not been sold.   They never told Wells what evidence they had.   The stock book was out of the way ; and all they pretended to produce was the list furnished by the secretary.   If an abstract is evidence, the original books should be accessible, that its truth may be seen by all. If he had sold, he might have re-purchased.   The denial of Wells was as good as the assertion of the inspectors. The vendee might have become insolvent, before the transfer was complete, in which case it might have been revoked.   Till the consideration is paid, there is no change of the property.

The authority to pass by-laws regulating elections, extends merely to the due ordering of the election in point of form ; not the qualifications of the voters.   The corporation can neither superadd to, nor detract from their rights. Besides, if the right to vote could be affected by the by-law, it passed too late, only about 30 days before the election. One-half the stock of the company might have been sold during the preceding 30 days, the right to vote upon which must be referred to the charter; yet the by-law is made to operate without regard to time, to affect previously vested rights.   Accordingly, it assumes a declaratory language. It does not enact simply, but declares that certain transfers are not contrary to the letter, but the spirit of the charter.   The mere suspicion of the inspectors was made a sufficient objec-

tion; and they, accordingly, may suspect every one who comes to vote against them.

They put down in a list, all whom the directors told them to suspect. The appearance of the name upon the list of suspected persons is deemed sufficient, until the suspicion is removed by an affidavit, made before some person having competent authority to administer an oath. This was intended to meet every case of a partial or total, conditional or absolute transfer. The oath required is voluntary and extrajudicial. The by-law could not be complied with; for no one has authority to administer a voluntary oath.

Besides being retroactive, the by-law was kept secret. It was exhibited for the first time during the hours of the election. It was fraudulent. Had it been known to the voters, they might have rescinded the disqualifying contracts; and they doubtless would have done so, indignantly, even at a sacrifice of half their interest.

The corporation had no right to require an oath by a by-law or in any other form. (2 Kyd on Corp. 112.) They have no greater power than an individual.

The negative could not be reached by legal proof, whereas the affirmative was susceptible of proof, and the burden of showing the transfer lay with the inspectors from the nature of the issue. In the case of *The People* v. *Kip and others*, (1 U. S. Law Journal, 286,) which will be found in point for the present application, this Court decided that a by-law, less arbitrary than the present, but directed to the same object was void.

*J. V. Henry*, said the validity of the election certainly depended upon the by-law. If that is void, the election can not be sustained. We agree that this depends upon the question, who are to be considered stockholders for the purpose of voting, within the true intent and meaning of the charter; and we deny that where there is a full and perfect transfer, the vendor can vote, though the assignment be not entered upon the books. An entry in the books is not necessary for the purposes of a transfer. The voter should have, not merely a nominal but a beneficial interest.

NEW YORK,
May, 1825.

The People
v.
Tibbets

This is the meaning of the charter. The holder for 60 days before the election must be the beneficial holder during that time; and neither the assignee nor assignor, within that period, have the right to vote. The vendees knew, or which is the same thing, were bound to know all this when they purchased. The act did not intend to tolerate a course of stock-jobbing, just before the election; and the case under consideration is a complete illustration of the evil. This Court, in *The Bank of Utica* v. *Smalley & Barnard*, (2 Cowen's Rep. 770,) decided that an assignment of bank stock was complete, as between the parties to it, though the charter expressly provided that the transfer should first be entered in the bank books. They declare this was necessary only in reference to the rights of the bank; that the property vested in the assignee absolutely, as it respected the vendor, without any entry.

If we are correct in saying that the charter of this company intended to exclude all persons from voting, unless they are beneficial holders, what then, we ask, is there, which is improper about this by-law? It is good within the authority conferred by the 8th section. Where a transfer is absolute, the vendee may insist on a conveyance presently. The control of the vendor is virtually gone. It is conceded that the vendee, who buys within the 60 days, cannot vote; and upon what principle shall this be allowed to the vendor who has parted with his interest, and has no further concern in the affairs of the company?

The company had power to pass the by-law in question. (Bac. Abr. *By-Laws*, (A). *Rex* v. *Spencer*, 3 Burr. 1838, per Wilmot, J.) True, a corporation cannot pass a by-law requiring an oath as to the due observance of statutes. (Bac. Abr. *By-Laws*, (E), Am. ed. of 1813.) The passage cited from 2 Kyd, 112, relates merely to the admission of a member. Not a word is quoted denying the power to impose an oath touching the rights of property. The by-law in question relates merely to the beneficial ownership. The case of *The People* v. *Kip and others*, cited from the Law Journal, does not apply. The language of the charter, under which the company there acted, differs from the one now

under consideration in respect to the qualifications of voters. It declared expressly that the one *in whose name* the stock stood, for a certain time before the election, should be entitled to the vote. The charter disregarded the beneficial ownership. In this case the word is *held ;* and we have shown it not enough that the voter is the mere nominal holder. Here the *beneficial,* there the mere *nominal* holding was looked to. The test is different. The by-law rightfully contemplates either a partial or total alienation of the stock ; and on suspicion of this, it puts the voter to his oath. Upon what ground can such a law be censured as inquisitorial ? It admonishes the voter, if he is owner, to say so on oath, before some one competent to administer it. If he is not owner, to remain silent. It establishes the only test by which the truth can be known, in a way sufficiently summary for the purposes of an election. This by-law subjects the party to no forfeiture or penalty. It deprives him of no right. It is no more than what a Court of Equity would require upon a bill filed by one of the parties. Yet no one ever dreamed of the proceeding being inquisitorial when exercised by that Court, where the most important rights are every day determined by an appeal to the party's own oath. The transfer is a matter of confidence and secrecy between the vendor and vendee. No evidence is within the power of the inspectors. The by-law does not stop with the oath of the party. He may introduce other proof. This is spoken of as being impossible ; not so. Suppose the sale conditional on its face ; let him prove this, and it negates an absolute sale.

If this provision be void, it does not vitiate other independent provisions of the by-law. It may be rejected as surplusage ; and the good parts of the by-law be allowed to stand without it. The transfer of a part of the stock operates as a disqualification *pro tanto ;* but if the by-law be void so far as it relates to a partial transfer, it may be good as to a total one, and the rest be rejected as surplusage.

If the by-law be in conformity to the spirit of the charter, it would still have been idle, if without the provision for proof by the oath of the party. This must, from the nature of the proceeding, be called for, and suspicion must

be made a ground for the call. It is pointed at secret transfers. If there be full, open, perfect knowledge of the transfer, absolute proof is easily accessible, or no proof at all might be necessary. If the legislature intended to permit these speculations in stock, within 60 days preceding the election, then the by-law is void, otherwise it is good. If good, there was a discretion incident to the power of passing it, as to all the legal means by which it should be carried into effect; and no choice was left with the directors, whether they would enforce it or not. The legislative power resided in other hands. The law was not clandestinely passed. All the stockholders might have had access to the books of the company, and have seen and examined it.

In *The People* v. *Kip & others*, the by-law contemplated an oath to be administered by the inspectors themselves. Here competent authority is required. We ask, if a voluntary oath before competent authority is criminal, or inadmissible, what becomes of notarial oaths, and the thousands of oaths which are administered to test, or to settle private rights, in the course of dealing among a commercial community?

The granting leave to file an information is matter of sound discretion. (Bac. Abr. *Informations*, (D). *Rex* v. *Grosvenor*, 2 Str. 1196. *Rex* v. *Marsden*, 3 Burr. 1812, 1816, per Ld. Mansfield, Ch. J.)

Where a corporation is private in its end, no information will be filed to determine the right of its officers. (Id.) The subject matter should be such as concerns the public. This is evident from the nature of the proceeding. There is not only judgment of ouster, but a fine for the misdemeanor. The charter, or franchise itself, is a different thing from the officers under it. It concerns the public, that no franchise should be usurped; but where a franchise confessedly exists, the objects of which are merely private, the Courts should treat the question of office arising in the company as equally private. It is like the mere question of appointing an agent by any individual. It is only when an office concerning the public is usurped, that the Court should interfere. Our statute, on which this application is grounded

(1 R. L. 108, s. 4,) is nearly a transcript from that of 9 Anne, which has uniformly been confined in construction to a usurpation upon the public. In a matter of mere private right, the party should be left to his action on the case, if he is wrongfully deprived of his corporate office. When our statutes are transcripts of the English statutes, the construction of both is the same. (*Taylor* v. *Delancy, per Curiam,* 2 Caines' Cas. Err. 151. *Case of Yates,* per Kent, Ch. J. 4 John. Rep. 359.) And this, though there may be a slight difference of phraseology between the two. Here is nothing relating to police or magistracy; nor does it come within the principle of *The People* v. *The Utica Insurance Company,* (15 John. 386 to 389.) There was an usurpation of banking powers, a franchise affecting the public. It did not relate to the mere officers of the corporation. But there is a difference even between the officers of a bank, which relates to the currency of the country, and a mere private corporation, like an insurance company.

*A. Van Vechten,* (same side.) The statute requires that a motion for leave should precede the filing of the information. The reason is, that the Court may see, whether a proper case for an information is made out. Every prosecution of this kind is brought forward with a double aspect. It looks both to an ouster from the franchise or office, and a fine for the misdemeanor; but are these objects applicable to the violation of a mere private office, a matter resting between individuals? The variance of our statute from the English consists merely in the introduction of the words *office* and *franchise,* generally, into our statute, which, as used there, relates to the exercise of a public right, and not a corporation concerning a private object. In the latter case, the law always puts the party aggrieved to his action on the case. Hence the distinction. It runs through the law. Public rights are vindicated by an information, or other criminal proceeding, at the suit of the people; private right, by action, at the suit of the person injured. It is a *non sequitur* that a franchise for a mere private purpose wants this extraordinary protection by in-

formation, because it is a franchise. Take the case of re-ligious corporations, summarily created under the general statute : Does an information lie ? This never was pre-tended. Indeed it was denied in *Rex* v. *Dawbeny*, (2 Str. 1196,) on the ground that the incorporation is private, and the right should be settled by action ; and the same thing was said in *Rex* v. *Marsden et al.* (3 Burr. 1812, 1818.) In *The People* v. *The Utica Iusurance Company*, (15 John. 386,) and in *The Same* v. *Kip et al.* (1 U. S. Law Journal, 286,) it is true, that an information was held to lie ; but the first related to a franchise, and the last to offices which affected the pecuniary concerns of the com-munity.

Again : where the remedy must be ineffectual, the Court will not interfere, even in relation to a public officer. This was held in *The People* v. *Sweeting*, (2 John. Rep. 184,) of one who had intruded into the office of town supervisor.

[WOODWORTH, J. In that case, there were but about three months of the year for which the officer was elected, remaining at the time of the motion.]

The offices in question here are annual ; and nearly two months of the year have gone. All experience denies the possibility of trying this right within the time for which the directors are chosen. The Court will not grant the infor-mation where the proceeding must be so palpably nugatory. (3 Bac. Abr. *Informations*, (D). *Rex* v. *Williams*, 1 Burr. 402, 407.)

It is said, the power given in the charter for the company to regulate elections, regards merely the form of proceed-ing. Gentlemen mean, I suppose, the manner of voting, whether by ballot or otherwise, and the creation of inspec-tors, &c. But it will not be denied, that the directors are so to regulate the election as to effectuate the intention of the legislature. It is a general rule, in relation to these matters, that the electors and elected should possess the same qualifications. The directors are required to hold in their own right ; and the general rule must be left to its ope-ration, unless it be plain that the legislature have created a

distinction by expressly conferring a right to vote upon the nominal holder. The Court will not infer such an absurd intention. The nominal holder is under no tie of interest to the company. He may wantonly and capriciously vote against the interest of his *cestuy que trust*. One object of the statute, in requiring the holding for 60 days previous to the election, was to prevent the election being wrested from the old stockholders, who were presumed better acquainted with the concerns of the company, by surprise. Are voters obtained here, by contract, on the spur of the occasion, as that kind of men who should control corporate elections ? Though the transfer be private, if a dividend is claimed by the transferee, it cannot be withheld. The entry upon the books does not affect the rights of the vendor and vendee, as between each other. The power to make by-laws must, from its nature, be as extensive as the objects to be effected by the corporation. It is incidental to every corporation and need not be expressed in the grant. By requiring the voters to hold for sixty days previous to the election, the charter intended to disqualify all others, and the by-law in question accords with the spirit of the charter, inasmuch as it is calculated to prevent the imposition of fraudulent voters. The second volume of Kyd on Corporations, (112,) is cited against the power to to administer an oath ; but the oath there treated of was one imposed upon admission into the company ; an oath not sanctioned by the charter in express terms, nor necessary to its end. All oaths are not forbidden. The case of *Rex* v. *Decan' et Capital' Dublin*, (1 Str. 539, per Eyre, J.) and *The City of London* v. *Vanacker*, (1 Ld. Raym. 496 to 500, 1 Salk. 142, S. C.) sanction the power to impose a voluntary oath, through a by-law of the company, where it is proper for the purposes of the institution. The distinction is, that the corporation have no right to create the officer by whom the oath is to be administered. It must, from its nature, be voluntary. There is no power to compel its administration. But it must be taken before some person competent by law to administer oaths. The cases upon which we rely, and the case of *The People* v. *Kip and*

NEW YORK,
May, 1825.

The People
v.
Tibbets.

*others*, (2 U. S. Law Journal, 286,) are reconcilable, upon this distinction. The by-law, in the latter case, required the voters to submit to the inspectors as to the sufficiency of the oath.

It is said here was no absolute sale; not bargains for stock; but bargains for votes. Be it so. This we say was a fraud, and properly met through the by-law. Nor can it make any difference that the oath was negative. It is good, according to the case cited from Ld. Raymond, 496 though it contain a negative, provided it conform to the spirit of the charter. And if there be any thing in the by law, which does not so conform, *quoad hoc*, the Court will disregard and reject it. The stock books are an uncertain and delusive test; for it is conceded that the person in whose name the stock stands may have no kind of interest; and there certainly can be no greater fraud than his voting for directors under such circumstances. The certificates of stock are better. Upon these, some indorsement must appear showing a transfer if any such in fact exist. But the oath of the elector is still more satisfactory, and is the test usually resorted to, at all our elections.

It is said that denying a trustee all right to vote, would affect the rights of executors and administrators. To this we answer, there is no danger of fraud in such cases. The holder comes in by act and operation of law. The act was intended to defeat voluntary sales, and absolutely prevent their being used for the purposes of fraud. The distinction between the two cases is strong and palpable.

This question is not, as supposed, one between the vendor and vendee of the stock. The sales, though they may be valid as to them, may yet be void as to the company, who have an interest in the votes to be given.

The *Attorney General*, in reply, said he was surprised to hear the objection that this Court have no right to interfere. It is said this proceeding is only applicable to the usurpation of a franchise belonging to the people, or intrusion into some public office; that it comes with a double object; that it is mixed of a civil and criminal character, seking not on-

ly an ouster of the offices but a fine for the intrusion. But this is not necessarily so. There are a variety of different franchises which form the subject of an information in nature of a *quo warranto*, as to some of which judgment of seizure may be given and some not. The latter class is where the people cannot exercise the franchise in question. The present is not a case of seizure. We need not contest the proposition, in terms, that an information will not lie where it goes to a mere private right. It may be true, with the qualifications allowed by the gentlemen. In some of the authorities cited, church wardens are mentioned as not subject to this proceeding; but they are in truth canonical officers; their election is in virtue of a canon of the English church. The instance of incorporations, in this country, to promote religious objects was unfortunate; for it has been expressly adjudged that an information lies against the officers of such an incorporation, who may be ousted, and a fine imposed. (*The Commonwealth* v. *Woelper*, 3 Serg. & Rawle's Rep. 29.) The imposition of a fine in such a case implies that these are to be considered public officers. *Rex* v. *Marsden et al.* (3 Burr. 1812,) was a case of conflicting markets; but the application was not denied upon the point of private right. The question is barely mentioned, but the Court forbear to intimate any opinion. It is sufficient, however, to say that these cases of gentlemen upon private right do not apply, because the question here is not of that character. The usurpation and injury are to be public, as in *Latham's case*, (3 Burr. 1485.) No remedy could be had by any individual of this company, as such. Against whom could an action be brought? Not against the inspectors, unless they acted maliciously. Against the directors for passing a void law? They too deny all malice, which takes away our remedy as to them. But suppose an action lies for the mistake, what would it avail the plaintiff? Could damages be given? And what is to be their measure? Who can estimate the amount? Nothing short of the general superintending power of the Court will reach the evil.

But whatever may be the rule upon the British act, there can be no dispute upon our own. When the English cases

say that the information must relate to a public matter, they evidently go on the narrow words of the statute of Anne. Our act is more comprehensive. It extended this remedy to an intrusion into, or a usurpation of *any office or franchise.*

Are not the conduct of corporations, however, a matter of public concern? Is it correct, in terms, to say the officers of a corporation are mere private agents? But if private, the information will be granted if there be circumstances of a public nature connected with their duties. What is a corporation? It is the creature of a statute; it is derivable from the people only. One incident is the power to make by-laws. In this case the directors are invested with that power. It is a part of the corporate franchise, to be governed by laws made in a particular manner. The body of the corporation have a right to insist that these laws shall be properly made. This right of making laws is a branch of the highest prerogative which the people themselves possess. I had supposed this question at rest by the case of *The People* v. *Kip et al.* cited from the Law Journal.

[WOODWORTH, J. The question was not made by the counsel; but the Court entertained no doubt of their right to interfere in that case.]

The right was not questioned at any stage of that controversy; but a plea was put in, and an issue taken. That case is spoken of as involving a higher degree of importance; because it related to a bank, which is connected with the pecuniary concerns of the community. But can that consideration constitute a distinction to affect this case? Will the Court adopt as a practical ground of action, the extent of the influence which a corporation may have upon the community. In *Commonwealth* v. *The Union Fire & Mar. Ins. Co. of Newburyport,* (5 Mass. Rep. 230,) the information was for the purpose of dissolving the charter. It was brought forward by a relator, to whose capacity an objection was made; in answer to which, the Court said "Informations of this nature are properly grantable for the purpose of inquiring into the election or admission of an officer

or member of a corporation, when moved for by any person interested in, or injured by such election or admission, if the same was unduly made. And upon such information, if the election or admission was illegal, judgment of a motion might be entered, and a fine might also be imposed on the party who had usurped upon the commonwealth;" thus laying down a doctrine repeatedly recognized and well understood by the books.

If the question in *The People* v. *Sweeting*, (2 John. Rep. 184,) were new, I should certainly submit whether, late as that application was made, the information might not have properly been allowed, for the purposes of a fine. *Rex* v. *Williams*, (1 Burr. 407–8,) sanctions an information for one single act of usurpation; and it will be seen by 2 Hawk. P. C. ch. 26, s. 14, that the statute of Ann. was passed with reference to annual offices. This is the reason, says the book, why that statute hastened the issue, by requiring the defendant to plead as of the same term when the information is filed. But the extent of the delay is, in this case, a mere matter of speculation; and it is enough that the relator is willing to take the risk of it upon himself.

Then, as to the main question. We say the object of this provision for a 60 days holding related merely to the form or shape in which the stock should be represented. It was to prevent delay and confusion at the election, by transfers made just before it commenced, and give the directors 60 days to make out the list of voters from the books; so as to have a certain and easy guide, on the day of election, corresponding with the stock book as it stood 60 days before. We agree there is no distinction, in general, between electors and elected; but it is enough that the statute has expressed an exception. The argument on the other side is, that by a transfer within the 60 days, the vendor loses his right, but the vendee acquires no right to vote; thus making a portion of the stock wholly unrepresented. What do gentlemen mean by a transfer? Do they mean an absolute executed sale? If so, the argument does not reach this case. If they mean a sale not yet consummated, we say the ownership remains in the vendor. Suppose an executory contract to be consummated

after the election; who is the voter? Is there a transfer? The transfer may be merely by parol, perhaps. If the vendor be not the stockholder, there is none who can hold; and if all the stock should be sold in this way, there would be no stockholders left; and not a soul to carry on the concerns of the corporation. Suppose a contract of sale which the parties agree should be executed 25 years hence, is the right of voting suspended during all that time? In truth, it is much like the question between the mortgagor and mortgagee in a popular election. The one who has possession of the land must vote there; the one who possesses the stock here. In *Stockdale* v. *The South Sea Company*, (2 Atk. 141,) it is said, "The company have no more right to inquire who is the true proprietor, when the trust does not appear, than a lord of a manor into a right to a copyhold estate when no trust appears; for the person whose name is entered in their books is, to all intents and purposes, with regard to the company, the proprietor." Suppose one agrees to sell land *in futuro* does not the vendor continue the freeholder till the deed is executed? Again, suppose the contract to transfer stock within the 60 days; though the transfer day passes, the property is not changed till an actual transfer; nor can the contract for a sale of stock be specifically enforced in a Court of Equity. (Newl. on Cont. 90, 91. 1 Madd. 402, last ed. *Nutbrowne* v. *Thornton*, 10 Ves. 161. *Mason* v. *Armitage*, 13 id. 37.) In the case cited from the U. S. Law Journal, the Court say, the inspectors should not go beyond the books. Indeed they use the same language, in substance, as does Ld. Hardwicke in *Stockdale* v. *The South Sea Company*, (2 Atk. 141.) So much—supposing the sales in this case executed. But it is plain, from the papers on both sides, that they were merely executory.

Now suppose either an executory or executed contract a disqualification; was not the by-law inquisitorial? The general power to pass by-laws does not, as supposed, depend on the question whether its object be beneficial or injurious to the corporation. It may be highly beneficial and yet void. The power depends upon the charter; and I deny that, under this charter, any by-law can be made to test the qualifi-

cations of electors. The directors can provide no means for this object unless they fairly result from the provisions of the charter. We are supported in this position by the cases cited on the other side, from Strange, 539, and Ld. Raymond, 496. To the same point is Carth. 482, S. C. as in Ld. Raymond. There the counsel say the oath in question was not imposed, but merely voluntary. They did not pretend to maintain the doctrine that the corporation might impose an oath. The objection was raised in Ld. Raym. 498. It arose upon a by-law of the city requiring as an excuse for any one elected sheriff, that he should swear and produce compurgators that he was not worth £10,000. It is said at page 498, to be unreasonable, because it *imposes* an oath, &c. At page 500, this is answered that it was a favor to the defendant, &c. and Holt, Ch. J. goes on to show how.

The sheriff was compellable to serve without the by-law; and it was passed for his ease and excuse. By simply making an affidavit, he was excused from a burthen. It was not demanded of him as a preliminary to his exercise of a corporate right; and the Court put the question on that ground. That very distinction settles this question in our favor; and it is also plainly settled by *The People v. Kip et al.* cited from the U. S. Law Journal. The ground that the oath was illegal, is there distinctly decided. It is a mistaken supposition that the manner of taking the oath was different from that prescribed in the present case. The words were precisely the same, as will be seen by the original papers. The affidavit was to be taken before any one competent to administer an oath. This is a stronger case against the directors. Mere suspicion is made the ground of rejection; and the by-law makes no provision for absentees, as, it will be seen, was the case in *The People* v. *Kip.* One who holds a proxy from another residing in England never could get in a vote under this law, if his constituent should unfortunately be *suspected* by the inspectors.

The law is also void as being retroactive, involving cases of transfer made before its passage. (2 Kyd on Corp. 112, 113. *Jackson* v. *How,* 19 John. 80.)

The provision in the by-law, for *other proof* of owner· ship is subject to the same objection, as the voluntary affi· davit. Such proof must be by voluntary oath, if had at all ; besides the intrinsic absurdity of requiring an impos- sibility, the proof of a negative, which no sensible system of jurisprudence ever did require, or ever will, in a question of property. The production of a stock certificate will not better the proof beyond the books. It may be in the hands of one having no manner of right. Besides, it would be inadmissible. Proof, in law, means legal proof, or proof on the oath of a disinterested person. (*Van Steenburgh* v. *Kortz*, 10 John. Rep. 167. *Brown* v. *Hinchman*, 9 id. 75.) The word *proof* is used in the by-law, and taking it in its legal signification, it never could reach a negative. The voter is required to negative, not merely that the sale is conditional or executory, but that there was ever any sale at all.

The cause having remained under advisement to the present term.

SAVAGE, Ch. J. now stated the facts ; upon which facts, he said, three questions had been made at the bar. The first respected the power and duty of the Court to grant the information in this particular case ; the second, what should be deemed a *holding* within the words of the char- ter, so as to constitute a voter ; and the third, the validity of the by-law, requiring an oath of the voter, or other proof as the test of his qualification.

The statute (1 R. L. 108) gives the remedy by *quo warran- to* against any person who shall usurp, intrude into, or unlaw- fully hold and execute any office or franchise within this state. To be a corporation is a franchise, (2 Bl. Com. 37,) for the usurpation of which an information always lies. ( 15 John. Rep. 386 to 389. 1 Str. 303.) And the question is, whether an intrusion into offices, created for the government or exercise of the franchise, is equally within the act as an usurpation of the franchise itself. The 9 Ann. c. 20, seems to treat a corporate office as, in itself, a franchise. The words of our statute are even broader than those of the Eng- lish ; and if, as was agreed upon the argument, they embrace

corporate offices which have an extensive influence upon
society, it is difficult to perceive any reason for limiting
their operations to these only, in exclusion of the less im-
portant offices of the same description.   There is certainly
nothing requiring this in the act itself.   The words of
the 9 Anne are, " that in case any person or persons shall
usurp, intrude into, or unlawfully hold and execute, the
office or franchise of mayor, bailiff, port reeve, or other
office within a city, town corporate, borough or place in
England or Wales," it shall be lawful, with leave, &c. to
file the information.   To these words, the King's Bench
did, at one time, consider some few mere private offices
or franchises an exception ; but later cases leave it doubt-
ful whether any such exception now exists.   No such
distinction upon our statute has ever been judicially re-
cognized ; nor do we feel warranted in governing our-
selves, upon these applications, by the greater or less de-
gree of public consequence attached to the office in ques-
tion.   Such a rule would be fluctuating, uncertain, and,
indeed, could never be reduced to practice.   The question
was not even raised in *The People* v. *Kipp & others*, de-
cided by this Court in August term, 1822, and reported in
The U. States Law Journal, 286.   Nor do we think it can
well admit of any doubt.   Indeed, the case would seem to
be within the English statute, which it is said extends to
offices relating to the government of a corporation.   (*Rex*
v. *The Corporation of Carmarthen*, 2 Burr. 869.    1 Bl.
Rep. 187, S. C.)

In *The People* v. *Sweeting*, (2 John. Rep. 184,) there
had been great delay in making the motion.   The office
of town supervisor, to which it related, would expire in
the short term of three months.; it was impossible that an
issue could have been sooner tried ; and the Court, in
their discretion, under the circumstances of that case, de-
nied the information.   Here the motion was brought before
us at the term next after the election.   We cannot refuse
it upon the mere chance that a trial may fail.   To do this
would be equivalent to a refusal in all cases, where the
office is annual ; a length to which we presume the Court

*Margin note:* NEW YORK, May, 1825.
The People
v.
Tibbets.

did not intend to go, and to which it was not necessary they should go, in *The People* v. *Sweeting*. On the whole we are clear, upon the nature of the case, as to our right of allowing the information to be filed ; and that the lapse of time is not such as to require us, in the exercise of a sound discretion, to deny it.

The second and third questions we shall not discuss at large ; because we think they are both disposed of by the *People* v. *Kip & others*. That case was said, at the bar, not to apply ; the qualification of the voter being that he should have held, *in his own name*, the stock on which he sought to vote, for a certain number of days before the election ; whereas it is here that he should have *held* simply, without providing that it should be in his own name. If there be any distinction, it is in favor of the present application. The provision in that case was more sedulously restrictive upon the voter, requiring not only a *holding*, but a holding in a particular manner, or to be evinced by a particular species of evidence. The case cannot, therefore, be distinguished, at most, in *favor* of these officers, by any difference of wording in the statute upon which it proceeded from the one now under consideration. On reflection, we are satisfied with the decision in that case.

Rule granted.(<i>a</i>)

(<i>a</i>) IN SUPREME COURT, August Term, 1822.

THE PEOPLE OF THE STATE OF NEW YORK, *at the relation of* JACOB BARKER, THOMAS HAZARD, JUN., and THOMAS M. HUNTINGTON,
*against*
LEONARD KIP, DAVID ROGERS, JOHN C. MORRISON, DUNCAN PHYFE, THOMAS DARLING, THOMAS BROOKS, CHARLES TOWN, ALEXANDER McMUIR, PETER A. JAY and ABRAHAM B. MEAD.

*Samuel A. Talcott*, Attorney General of the People of the State of New York, moved, on Tuesday the eighth instant, for leave to file an information in the nature of a *quo warranto* against the defendants above named, who claim to be directors of the North River Bank of the city of New York. This motion was founded on a bill in Chancery recently filed against the defendants and others, by James D. P. Ogden, Jacob Barker and others, and on the answers to that bill, and also on an affidavit showing that the relators above named are stockholders in the North River Bank.

On Friday, Chief Justice SPENCER delivered the opinion of the Court, to the following effect :—

" These applications being generally founded on the *ex parte* affidavit of the relators, it has of late years been usual in the English Court of King's Bench, and in this Court, to afford the defendant an opportunity of being heard against granting leave to file the information. A rule to show cause is, therefore, generally entered; and leave is afterwards granted or refused, as circumstances shall appear upon cause shown. In the present case, the application is for leave to file the information in the first instance. There is no doubt that the Court are bound to exercise a reasonable discretion on the subject; and this cause comes before us in a manner so peculiar, that we think it proper to except it from the general rule. The application does not rest upon a mere *ex parte* affidavit. The evidence placed in our hands comes from the defendants themselves, or from a source most favorable to them. We have the sworn answers of the defendants to a bill in Chancery, filed in relation to the very election complained of. We have also the answers of the inspectors of that election. Upon a rule to show cause, nothing could be alleged by the defendants against granting leave to file the information, which is not already urged on their part, in the papers presented to the Court. We have looked into the answers, and we find the defendants and the inspectors admitting a state of facts, which not only render it proper to grant leave as applied for, but which seem to us imperiously to require it at our hands. To give time under such circumstances, would be an abuse of the discretion vested in this Court. We will briefly advert to a part of the case, as admitted by the defendants and inspectors. A controversy existed among the stockholders of the bank, a portion of whom were desirous to effect a change in the direction. A few days before the election, a by-law was passed by the board of directors, of which board most of the defendants were members and then present, authorizing any stockholder to challenge the votes offered at the election; and if supported by affidavits or other probable cause, to the satisfaction of the inspectors, that they might then require the person whose vote should be challenged, to make oath in answer to the cause of challenge, the sufficiency of which should be determined by the inspectors; and if such oath was refused, that the vote should be rejected. Under this by-law, votes given upon the proxies of several persons, who appeared, from the books of the bank and the certificates of the cashier, as stockholders to a large amount, were challenged on the ground that the persons in whose names the stock stood, and who held the certificates of the bank, were not the exclusive owners, but that some third person or persons had an equitable interest therein. This was considered by the inspectors as good cause of challenge; and the persons whose proxies were thus objected to, were required, notwithstanding the most urgent remonstrances to the contrary, to make affidavits in writing in answer to these allegations, and to answer, under an oath prescribed by men who did not themselves act under the solemn obligations of an oath, to various verbal interrogatories, and to submit to a sort of inquisitorial examination at variance with the fundamental principles of our civil and political institutions, at the pleasure of the inspectors. In this manner, votes upon a great number of shares were entirely disregarded by the inspectors. It is evident, from the answers, that if all the votes received into the hands of the inspectors from persons duly autho-

NEW YORK, rized to give such votes, had been estimated by the inspectors, that the result
May, 1825. would have been different from that declared by the inspectors; as, in such
_____ case, the persons whose seats are now contested, could not have been certified
The People to have been elected.
v.
Tibbets.     "Without entering any further at this time into the facts disclosed, we
are unanimously of opinion, that the by-law, and the proceedings under
it at the election, were most illegal and reprehensible. The act of incor-
poration provides, ' that each stockholder shall be entitled to one vote in
each share of the stock of the bank, which he shall have held in his own
name at least fourteen days previous to the time of voting.' (Sess. 44, ch.
146, § 8.) Further than this, the inspectors had no right to inquire, as it
was not competent for the directors to pass any by-law at variance with the
positive provisions of the act incorporating the bank. We therefore feel our-
selves called upon to grant the motion; more especially as the statute con-
templates, in cases of this sort, the most speedy and effectual proceedings
which a due regard to the rights of parties and the proper administration of
justice will permit."

    Leave granted to file the information *instanter.*

Counsel for the plaintiffs, $\begin{cases} S.\ A.\ Talcott, \text{ Att'y Gen.} \\ Benjamin\ F.\ Butler. \end{cases}$

Counsel for the defendants, *Samuel Jones.*